# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WESTINGHOUSE AIR BRAKE<br>TECHNOLOGIES CORPORATION<br>(d/b/a WABTEC CORPORATION)<br><br>　　　　Plaintiff,<br><br>　v.<br><br>SIEMENS MOBILITY INC.,<br><br>　　　　Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:　C. A. No. 17-1687-LPS<br>:<br>:<br>:<br>:<br>: |

Steven L. Caponi, K&L GATES LLP, Wilmington, DE

Alan L. Barry, Jason A. Engel, Benjamin E. Weed, Devon C. Beane, Gina A. Jenero, and Jacob C. Vanette, K&L GATES LLP, Chicago, IL

　　Attorneys for Plaintiff.

Jack B. Blumenfeld, Karen Jacobs, and Stephen J. Kraftschik, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Mark Supko, Kathryn L. Clune, Vincent J. Galluzo, and Joshua M. Rychlinski, CROWELL & MORING LLP, Washington, DC

Jacob Z. Zambrzycki, CROWELL & MORING LLP, New York, NY

　　Attorneys for Defendant.

## MEMORANDUM OPINION

January 25, 2019
Wilmington, Delaware

**STARK, U.S. District Judge:**

Plaintiff Westinghouse Air Brake Technologies Corporation (d/b/a Wabtec Corporation) ("Wabtec" or "Plaintiff") has brought this patent infringement suit against Defendant Siemens Mobility Inc. ("Siemens" or "Defendant") asserting U.S. Patent Nos. 7,398,140 (the "'140 patent"), 8,175,764 (the "'764 patent"), and 8,478,463 (the "'463 patent"). The three patents generally relate to certain aspects of train control.

Presently before the Court is the issue of claim construction. The parties submitted one technology tutorial (*see* D.I. 135), claim construction briefs (*see* D.I. 134, 136, 151, 152), and exhibits (*see* D.I. 137). The Court held a claim construction hearing on November 26, 2018, at which both sides presented oral argument. (*See* D.I. 175 ("Tr."))

## I.     LEGAL STANDARDS

The ultimate question of the proper construction of a patent is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted).

"[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324. Instead, the Court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."

*Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide. . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope

using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)) (internal quotation marks omitted).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to

establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Furthermore, "statements made by a patent owner during an IPR [inter partes review] proceeding . . . can be considered for claim construction." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017). Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

## II. CONSTRUCTION OF DISPUTED TERMS[1]

### A. "Indicator"[2]

| |
|---|
| **Wabtec** <br> Plain and ordinary meaning |
| **Siemens** <br> "a notification regarding whether or not to manually activate the horn device"[3] |
| **Court** <br> "a notification regarding whether or not to manually activate the horn device" |

The parties dispute whether the term "indicator" is limited to activation of the horn. Wabtec argues that the '140 patent has broad application, applying to "operator vigilance generally," while Siemens argues that the patent relates more specifically to manual horn activation. (*See* D.I. 134 at 4; D.I. 152 at 3-4) As Siemens and the patent explain, alerter systems involving visual and audible indications to gain the attention of the crew were known in the prior art. (*See* Tr. at 13; '140 patent at 1:44-51) Yet, as the specification provides, there was "a need in the art" for a crew alerter system or control system to "provide vigilance for the express purpose of reminding the operator to sound the locomotive horn at a grade crossing." ('140 patent at 1:63-67) Therefore, the present invention is "an operator warning system and method for improving locomotive operator vigilance that provides alarms or indicators for the express purpose of reminding the operator to sound the locomotive horn at various positions on

---

[1] In the attached order, the Court also adopts the parties' agreed-upon construction for another term.

[2] This term appears in claims 1 and 23 of the '140 patent.

[3] Siemens proposed a modified construction in its responsive brief. (*See* D.I. 152 at 1, 3, 5) The modified construction is shown in the chart.

5

the track, such as at grade crossings." (*Id.* at 2:25-30; *see also id.* at 2:52-55)

As Wabtec acknowledged, the patent contains no discussion of "indicators" that is outside the context of a horn. (*See* Tr. at 9) ("I don't believe that there is an actual explicit disclosure of an indicator outside the context of sounding the horn.") Wabtec's contention that limiting the scope of the claimed "indicator" to sounding of the horn improperly imports a limitation from the specification to the claims is unpersuasive.

The preambles of claims 1 and 23, which discuss "a locomotive having a horn system with a horn activation actuator and a horn device configured to produce a noise," further support a conclusion that the claimed invention involves an indicator to the operator regarding whether or not to activate the horn. ('140 patent, cls. 1, 23; Tr. at 15)

Finally, the prosecution history confirms that Siemens' construction is proper. For example, the applicant distinguished the prior art as claiming a system that "specifically requir[es] automatic (as opposed to manual/human) horn sequencing." (D.I. 132 Ex. E at 5-6)

B. "Feature Data" Terms[4]

| Claim Term | Wabtec | Siemens | Court |
|---|---|---|---|
| "primary" | "default" | Construe full phrase below | "default" |
| "secondary" | "backup" | Construe full phrase below | "backup" |
| "safety device" | "device that can indicate an unsafe condition" | Construe full phrase below | "device that can indicate an unsafe condition" |
| "safety arrangement" | "device, action, process, or system that can indicate an unsafe condition" | Construe full phrase below | "device, action, process, or system that can indicate an unsafe condition" |
| "implemented safety action" | "indication by a safety arrangement of an unsafe condition" | Construe full phrase below | "indication by a safety arrangement of an unsafe condition" |
| "primary safety device data" | Construe shortened phrases above | Indefinite | Not indefinite, No construction |
| "secondary safety device data" | Construe shortened phrases above | Indefinite | Not indefinite, No construction |
| "primary safety arrangement data" | Construe shortened phrases above | Indefinite | Not indefinite, No construction |
| "secondary safety arrangement data" | Construe shortened phrases above | Indefinite | Not indefinite, No construction |
| "primary implemented safety action data" | Construe shortened phrases above | Indefinite | Not indefinite, No construction |
| "secondary implemented safety action data" | Construe shortened phrases above | Indefinite | Not indefinite, No construction |

---

[4] These terms appear in claims 1, 6, 7, and/or 21 of the '764 patent.

The dispute between the parties is whether a person of ordinary skill in the art ("POSA")[5] would understand the scope of the claims, including the meaning of the feature data terms and phrases, with reasonable certainty. Pursuant to 35 U.S.C. § 112, "a patent's claims, viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

The '764 patent relates to a system that communicates the conditions and states of safety features in a transit system to the train based on the train's location on the track relative to various safety devices and arrangements along the tracks. (*See* '764 patent at 1:8-15, 2:36-3:15) The feature data broadly includes primary safety device data, secondary safety device data, primary safety arrangement data, secondary safety arrangement data, primary implemented safety action data, and/or secondary implemented safety action data, among other types of data. (*See id.* at 2:42-47)

As an initial matter, the Court finds it appropriate to consider the terms separately, rather than the complete phrases, because "primary" and "secondary" are modifiers, the meaning of "data" is not disputed, and the remaining phrases are used repeatedly in the patent. The Court agrees with Wabtec that the specification describes the terms "primary" and "secondary" as modifiers whereby "primary" is the normal or default approach and "secondary" is the backup in the event that the default fails. (*See* Tr. at 21)

---

[5]While the parties dispute the identification of a POSA for this case, they agree that it does not impact the claim construction disputes and that the Court need not resolve their dispute at this time. (*See* Tr. at 31, 38)

While Siemens acknowledges that there are a few examples of the features terms in the patent, Siemens argues that a POSA would not be able "to determine whether any devices, arrangements or actions not specifically mentioned in the specification are within or outside the scope of the claims." (D.I. 152 at 8) Wabtec counters that the examples in the patent are illustrative and "indicative of the types of situations and devices the '764 Patent envisions for the disputed terms." (D.I. 151 at 9) Siemens' only argument for indefiniteness is that the patent does not provide sufficient examples to permit a POSA to understand the scope of the claims; Siemens concedes that overlap among the terms does not make the claims indefinite. (*See* Tr. at 36-37) As Wabtec noted at the hearing (*id.* at 30-31), Siemens has not provided any evidence, such as an expert declaration, to support a finding that a POSA would not understand the boundaries of the claim. The Court is not persuaded by Siemens' arguments that a POSA would read the patent and the examples provided and not understand the scope of the claims with reasonable certainty.

### III. CONCLUSION

The Court construes the disputed and undisputed terms as explained above. An appropriate Order follows.